AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

FILED ___ LODGED
___ RECEIVED

**NOV 20 2019**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY ___ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Facebook account cassie.jean.bebereia, more fully<br>described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. *MJ19-5233*

## APPLICATION FOR A SEARCH WARRANT

      I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Facebook account cassie.jean.bebereia, more fully described in Attachment A, incorporated herein by reference.

located in the _____ **Western** _____ District of _____ **Washington** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ☑ contraband, fruits of crime, or other items illegally possessed;

    ☑ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 641, 1001, 1361 | Theft of government property; false statements; depredation of government property |
| 18 U.S.C. §§ 3372, 1855, 844 | Trafficking in illegally cut timber; setting timber afire; using fire in furtherance of felony |
| 18 U.S.C. § 371 | Conspiracy to commit offenses against the United States |

The application is based on these facts:

    ✓ See Affidavit of David Jacus, continued on the attached sheet.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

David Jacus, Law Enforcement Officer, USFS
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____ 11/20/2019 _____

_____
*Judge's signature*

City and state:  Tacoma, Washington

David W. Christel, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

County of Jefferson      )
                         )      ss
State of Washington      )

I, David Jacus, a Law Enforcement Officer with the U.S. Forest Service on the Olympic National Forest, Quilcene, WA, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been employed as a Law Enforcement Officer with the U.S. Forest Service, Law Enforcement and Investigations, since March 2009, and am currently assigned to the Olympic National Forest. My duties include detection and enforcement of criminal law offenses and apprehending persons who committed or were suspected of committing offenses on or affecting the National Forest System, to include natural resource crimes. Prior to my employment with the United States Forest Service, I was a Law Enforcement Park Ranger with the National Park Service stationed at North Cascades National Park, Marblemount, WA. My duties were enforcing federal laws and regulation related to the management and protection of the National Park.

2.      I have completed the Federal Law Enforcement Training Center's Land Management Police Training Academy at Glynco, GA in February 2008. I graduated from the National Park Service Seasonal Law Enforcement Academy at Santa Rosa Community College in 2003. In May 1998, I earned a Bachelor of Science degree in environmental studies from University of Buffalo, NY.

3.      The information in this Affidavit is based upon the investigation I have conducted in this case, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation.

4.      Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are relevant to a determination

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   of probable cause to support the issuance of the requested warrant.  When the statements

2   of others are set forth in this affidavit, they are set forth in substance and in part.

### PURPOSE OF APPLICATION

4       5.      I make this Affidavit in support of an application under Rule 41 of the Federal

5   Rules of Criminal Procedure and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)

6   to require Facebook for a warrant for information associated with the Facebook account

7   cassie.jean.bebereia (the "SUBJECT ACCOUNT"), stored at premises controlled by

8   Facebook, a social media platform headquartered at 1601 Willow Road, Menlo Park, CA

9   94025.  This information is further described in Attachment A.

10      6.      As further discussed below, the Subject Account is maintained by a Hood

11  Canal-area resident named Cassie Bebereia.  Bebereia is presently referenced as an

12  unindicted co-conspirator in a pending criminal case.  Bebereia is herself presently under

13  investigation for conspiracy in violation of 18 U.S.C. § 371 and making false statements in

14  violation of 18 U.S.C. § 1001.  I previously obtained a warrant from this Court to search a

15  cell phone in Bebereia's possession.  The results of that search, as well as other subsequent

16  investigation, establishes probable cause to believe that material relevant to the

17  investigation of Bebereia and her boyfriend, Justin Wilke, exists in Bebereia's Facebook

18  account.

19      7.      Accordingly, the search warrant would require Facebook to disclose to the

20  government copies of the information (including the content of communications) further

21  described in Section I of Attachment B.  Upon receipt of the information described in

22  Section I of Attachment B, government-authorized persons will review that information to

23  locate the items described in Section II of Attachment B.

### BACKGROUND ON INVESTIGATION

25      8.      ***The Maple Fire Investigation:***  On August 4th, 2018, at approximately 2

26  p.m., I learned from the Puget Sound Interagency Communications Center about a wildland

27  fire, hereafter referred to as the "Maple Fire," near Elk Lake, in the Olympic National

28  Forest.  Firefighters who initially responded to the fire stated that it was, at the fire's

JACUS AFFIDAVIT - 2
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   inception, burning in a big-leaf maple tree near Jefferson Creek.  About one hour later,

2   when I arrived at the forest road spur leading to the trailhead closest to the fire's origin site,

3   I spotted a Lilliwaup, Washington resident named Justin Wilke driving out of that short

4   spur road.  Shortly thereafter, I met and interviewed Wilke and Lucas Chapman, both of

5   whom were camping at a nearby campsite. Wilke stated that he was on the spur road

6   because he had been using a restroom at the trailhead.  Wilke further stated that he knew

7   nothing about the fire, that he had not been harvesting timber, and that he did not have a

8   chainsaw with him at the campsite.  I also met and interviewed Cassie Bebereia, believed

9   to be Wilke's girlfriend, who similarly stated that Wilke had not been harvesting timber,

10  and similarly insisted that Wilke did not have a chainsaw with him at the campsite.

11          9.      Firefighters located several items at the fire's origin site: a gas can, a

12  Gatorade bottle, two aerosol cans of wasp killer, and a backpack filled with tools associated

13  with harvesting timber, including chainsaw chains, a coring tool used to drill into trees, and

14  other tools, as well as a sweatshirt, keys, and headlamp.  Alan Richert, Wilke's neighbor

15  at the time and sometime logging partner, later identified the sweatshirt as Wilke's and

16  would identify one tool, a pair of channel locks, as being Richert's own property, which

17  had gone missing.

18          10.     On August 8th, 2018, Washington State Department of Natural Resources

19  Fire Investigator Albert Kassel performed a Cause and Origin Investigation with respect to

20  the Maple Fire. Investigator Kassel determined the fire was human-caused and had started

21  at the base of the maple tree identified by firefighters who initially responded to the fire.

22  Both I and Investigator Kassel also noticed that the maple tree had several areas from which

23  the bark had been intentionally scraped or cut away, a method commonly used by timber

24  thieves to "check" the quality of a tree's wood prior to logging the tree.  Based on the

25  presence of these check marks on the tree at the origin of the fire and the logging equipment

26  recovered in the vicinity of that tree, law enforcement concluded that maple poachers had

27  likely been preparing to log that tree when the fire began.

28

JACUS AFFIDAVIT - 3
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

11.     On August 13th, 2018, law enforcement received a tip from Karen Kenmir, who related information from her sister, who had heard that three individuals, named "Cassie, Justin, and Thor," had been attempting to kill bees using fire, but that the fire "got away" from them.   A few days later, law enforcement identified "Thor" as Shawn Williams.

12.     On August 23rd 2018, law enforcement interviewed Richert.  Richert stated that he has logged with Wilke in the past, and had taught Wilke how to log trees, and that he often saw Wilke that summer processing maple wood blocks outside Wilke's residence, a short distance from Richert's residence.  Richert will later stated under oath that he had seen Wilke use a Stihl 460 chainsaw to cut wood.

13.     Richert also stated in his initial interview that Wilke had admitted to Richert the following: Wilke, Chapman, and Williams had been attempting to cut down and process a maple tree, but there was a bee hive in the tree, so the three of them poured gasoline on the tree and lit it in an attempt to kill the bees. The group believed the fire was extinguished before they departed the area. Richert stated that Williams and Bebereia were present when Wilke was talking about the incident leading to the Maple Fire.  When re-interviewed in 2019, and when he spoke under oath in this case, Richert recalled Williams, rather than Wilke, had related the story described above regarding the origin of the Maple Fire, and that Wilke, though present during the conversation, had stated something to the effect of "I didn't do anything" during Williams' conversation with Richert.

14.     Marty Thompson, another neighbor of Richert's and Wilke's, was also interviewed on August 23, 2018.  He stated that he had not seen Wilke or Bebereia in "a while."

15.     Law enforcement next learned from Jason Roberts, the owner of a wood-processing mill in Tumwater, Washington, that he had purchased maple wood blocks from Wilke from April through August 2018. Jason Roberts had last spoken to Wilke on August 2nd, 2018, while purchasing maple blocks from Wilke.  Roberts' ledger detailed 21 sales of maple wood from Wilke to Roberts between April 25 and August 2, 2018, including a

JACUS AFFIDAVIT - 4
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

large sale on July 3, 2018.  The ledger further detailed the Washington State Specialized Forest Products permit number associated with each sale. Based on the ledger, Wilke presented one of two such permits to Roberts during each of the sales on Roberts's ledger. One of the two property owners listed on those permits, Marlane Hoback, informed law enforcement that she did not have any maple trees on her property, and that neither Justin Wilke nor Alan Richert (the individual listed as the seller on the permit) had removed any wood from her property. Hoback's permit was used by Wilke to sell wood to Roberts on 11 occasions between April 25 and June 15, 2018.[1]

16.    Law enforcement collected samples of the wood that Roberts identified as having been purchased from Wilke.  Law enforcement also identified and took wood samples from three maple trees that had been illegally logged in the near vicinity (within a quarter mile) of the maple tree that was the origin site of the Maple Fire. Subsequent DNA testing of those samples, as well as the samples collected from Roberts' mill, revealed that a significant fraction (83 total blocks of wood, out of a total of approximately 225 blocks) of that wood that Wilke sold to Roberts came from the three maple trees located in the Olympic National Forest and near the maple tree that was the origin site of the Maple Fire.

17.    Law enforcement has also interviewed Lucas Chapman on several occasions. Initially, Chapman denied any involvement in logging in the national forest and stated that he had not seen Wilke with a chainsaw.  Chapman later recanted that story, and both told law enforcement and testified that, on a camping trip with Wilke, Williams, and Bebereia, Wilke had led Chapman and Williams in walks in the area near Jefferson Creek and Elk Lake, looking at potential maple trees to harvest. Chapman was going to be paid by Wilke to help carry out blocks of maple wood. On August 4, 2018, Chapman was with Wilke and

---

[1] The second property owner listed on those permits, Charles Budd, stated that Wilke removed only a portion of the wood that he was supposed to remove from Budd's property.  Investigators have sampled a tree from Budd's property that Wilke allegedly harvested to determine whether that tree is a maple tree and whether that tree represents a DNA match to any of the wood that Wilke sold to Roberts during the summer of 2018.  The results of that DNA testing have, to date, been inconclusive.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Williams when they encountered the maple tree at the origin of the Maple Fire. Chapman stated that a bee's nest prevented them from logging the tree, so they sprayed the bee's nest with wasp killer spray. When that did not work, Wilke set fire to the bee's nest. Chapman was later called over to help Wilke and Williams put out the fire using Gatorade bottles. When they believed the fire was out, Chapman returned to the campsite with Wilke and Williams. During an interview with law enforcement, Chapman stated that Wilke had a chainsaw with them on the camping trip and that Wilke had hidden the chainsaw in the forest after being confronted by law enforcement about the fire.

18.     Law enforcement also interviewed Sondra Palafox and Samuel Davies, who confirmed that they went on a camping trip with Justin Wilke into an area near Elk Lake, and so near the origin site of the Maple Fire, in early July 2018. Palafox and Davies stated that they did not see or hear Wilke log maple wood during this trip, but Palafox stated under oath that Wilke left the campsite for significant periods of time, and left the campsite at one point in his car. A U.S. Forest Service employee, Jeffrey Gehring, later stated that in the same area, on July 2, 2018, he saw two white males, one described as bald with facial hair and the other wearing a hoodie sweatshirt with the hood pulled up, walking down the spur road from the mainline FR 2401 with a black dog. Gehring believed these two individuals were associated with a nearby vehicle—based on their proximity to the vehicle, the absence of other vehicles or people nearby, and the vehicle's windows being down, indicating that its owner was nearby—that contained a chain saw, a log chain, and rope in its truck bed.

19.     ***The Pending Charges:***  On August 28, 2019, Wilke and Williams were indicted in eight-count indictment charging conspiracy in violation of 18 U.S.C. § 371; theft of public property in violation of 18 U.S.C. § 641; depredation of public property in violation of 18 U.S.C. § 1361; trafficking in unlawfully harvested timber in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(1) and 3373(d); setting timber afire in violation of 18 U.S.C. § 1855; and using fire in furtherance of a felony in violation of 18 U.S.C. § 844(h)(1). That case is currently pending trial and is cause number CR19-5364BHS.

JACUS AFFIDAVIT - 6
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Bebereia is the unindicted co-conspirator referred to as "Person 1" in the Indictment. The indictment alleges that Bebereia accompanied Wilke during some of the offense conduct, and further, that she provided false information to me on the day I responded to the fire.

20.     ***Interview of Cassie Bebereia:***  On November 4, 2019, I interviewed Cassie Bebereia, who, as noted above, is believed to be Wilke's girlfriend.  Bebereia made statements during the interview that are contradicted by known evidence, and that therefore appear to be false.  For example, Bebereia denied that either she or Wilke was involved in logging in the national forest or in setting the Maple Fire.  Bebereia further stated that neither Wilke, Chapman, nor Williams had a chainsaw in their possession when they were camping during the days leading up to August 4, 2018.  However, mill owner Jason Roberts testified, and his business records corroborate, that at least Wilke and Thor sold maple to Roberts on August 2, 2018.  DNA evidence establishes that this maple originated from a tree located within approximately 250 yards downstream from the camp site where Bebereia, Chapman, and Wilke were observed on August 4, 2018.  Bebereia also conceded that she had been sick and inside her tent for most of the August 4, 2018 camping trip with Wilke in the area of the national forest near where the fire began.  Based in part on this interview, Bebereia is currently under investigation for making false statements under 18 U.S.C. § 1001.

21.     Bebereia stated that on August 4, 2018, after the fire had begun, she both called and texted a friend of hers, Drew Parks, and requested that Parks help her and Wilke by driving to Wilke's campsite to help them leave the area given the presence the forest fire.  (Parks stated to law enforcement in a prior interview that he had in fact driven into the national forest that day, and had given Williams a ride home after the fire had already begun).

22.     When asked what phone she currently used, Bebereia stated that she was attempting to have a phone set up for her, and then stated that she was currently using a phone that she identified as Wilke's phone, which she produced.  She also provided the phone number for that phone as 360-401-9879.  In a subsequent interview with Drew Parks

JACUS AFFIDAVIT - 7
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

on November 5, 2019, Parks informed me that Bebereia had communicated with him using that phone number within the last few weeks.   During his initial interview with law enforcement on August 23, 2018, Richert provided the same phone number—360-401-9879—as the then-correct phone number for Justin Wilke.

23.     At a later point in the interview, Bebereia showed me what I believed to be text messages on the phone from November 2018 that she stated were between her and another individual regarding a chainsaw that was allegedly stolen from Wilke during the summer of 2018. Bebereia stated that the text messages proved that Wilke did not have a chainsaw with which to log maple during August 4, 2018. However, when I examined the text messages, I observed that in one message Bebereia told the recipient individual that the chainsaw that was allegedly stolen was *not* Wilke's chainsaw, which was directly contrary to the statement Bebereia had just made to me. The communications included a picture of the chainsaw that had allegedly been stolen.

24.     ***The November 6 Search Warrant and Discovery of Facebook Messenger Chats:***   On November 6, 2019, the Honorable David Christel issued a search warrant authorizing law enforcement to search the phone for certain communications.   On November 18, 2019, while searching the device in "airplane mode", I realized that the messages that Bebereia had shown me on November 4, 2019 were not text messages. Instead, those messages could be accessed from the Facebook application on the device, by selecting the Facebook messenger icon within the Facebook application.   Within this Facebook messenger section of the Facebook application, I could access messenger communications dating back to September of 2018; those communications were grouped into "threads" based on the other user with whom the user of the Facebook app was communicating.   These appear under the heading "Chats."

25.     However, it appeared that there were other messenger communications that were not visible on the phone.   For certain messenger communication threads—and specifically the communication thread with user "justin.wilke.52"—it appeared that I could not see all of the messages in the thread.   Instead, at the bottom of the screen, the words

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"Load more ..." appear.  The device appears unable to load more messages while in "airplane mode."  Similarly, though there are 39 conversations listed under the "Chats" heading, at the bottom of the listed conversations, the words "See more" are present.  I understand that to mean that, if the device were able to connect to Facebook's servers (that is, if it were not in "airplane mode"), the user of the device could access additional "Chats" with other users that are not accessible while the device is in "airplane mode."

26.   ***Review of Recorded Calls:***  On November 19, 2019, I reviewed recorded calls placed from the detention facility at FDC SeaTac by Justin Wilke.  On October 9, 2019, Wilke placed a call to the phone number 360-401-9879.  A voice I recognize as Bebereia's can be heard picking up that phone.  During that call, Wilke states that "Marty and Alan told them that I left all that shit behind, ... and I was running from em.  That wasn't the case, they didn't let ... me come back and get my stuff."  Later, Bebereia states "They didn't want us down there" and "[unintelligible] on Facebook there's still messages saying ... telling us not to come home, I'm sure there probably is."  Wilke responds: "Yeah, you need to give that to my lawyer."  Based on the fact that Marty Thompson and Alan Richert are former neighbors of Wilke and Bebereia, each of whom cooperated with law enforcement, in this call I understand Wilke to be referring to Thompson and Richert when he says "Marty and Alan" and Bebereia to be referring to Thompson and Richert when she says "They didn't want us down there."

27.   In a phone call on October 10, 2019, Wilke called someone whom Wilke referred to as "Mom" throughout this and other conversations.  At one point, Wilke states "Marty and Alan told the cops that I was fleeing from them, I was running from them, and all that stuff, but when Marty fucking sent me a text, he kinda fucked up, he sent me a text, he said, 'Don't ever come back here again or I'm gonna shoot ya.'  You know what I mean?  When you send a text like that, I'm going to save that shit."

28.   In a phone call on October 12, 2019, Wilke again placed a call to the phone number 360-401-9879.  Again, a voice I recognize as Bebereia's can be heard picking up that phone.  During that call, Wilke asks about Bebereia's communications with his lawyer.

JACUS AFFIDAVIT - 9
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

She states: "He just kept emailing me, saying cool thanks send me more messages, but that's the only message we had." Bebereia later states: "And hopefully, with that message, or the message that I sent him, it doesn't sound very good for us, for the most part, but it's just, bullshit, but it does state that, uh, we were told not to come back and shit and that the feds will catch up to us sooner or later … and it does say, don't come back." Based on that conversation and the two prior conversations, I believe that Bebereia located the Facebook message she was referring to from Marty Thompson. Bebereia's statement that the message "doesn't sound very good for us" suggests that the message contains relevant, and potentially incriminating, information, particularly with respect to flight.

29.     I was unable to access any communications with a user identifiable as Marty Thompson, and I was unable to access any communications that matched the description provided by Bebereia and Wilke in their jail call communications. Therefore, I believe these messages likely reside outside of the phone, in servers or data maintained by Facebook.

30.     The user image for the Facebook application on the phone is an image of Bebereia that matches the image of Bebereia that appears on the front page of the SUBJECT ACCOUNT when it is viewed publicly. For that reason, I believe the messages referenced above regarding a chain saw were contained in the SUBJECT ACCOUNT.

31.     I believe that the SUBJECT ACCOUNT is likely to contain communications the content of which would serve as potential evidence of the crimes charged in this case, namely conspiracy in violation of 18 U.S.C. § 371; theft of public property in violation of 18 U.S.C. § 641; depredation of public property in violation of 18 U.S.C. § 1361; trafficking in unlawfully harvested timber in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(1) and 3373(d); setting timber afire in violation of 18 U.S.C. § 1855; using fire in furtherance of a felony in violation of 18 U.S.C. § 844(h)(1), and making false statements in violation of 18 U.S.C. § 1001.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

32.     Further, I believe that the SUBJECT ACCOUNT may have information helpful to identifying the individuals seen by Jeff Gehring in the national forest on July 2, 2018, including photographs of Justin Wilke and/or his pet dog(s) around that time.

### BACKGROUND ON FACEBOOK'S SERVICES

33.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

34.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

35.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who

JACUS AFFIDAVIT - 11
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

38.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

39.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history

JACUS AFFIDAVIT - 12
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

40.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

42.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a

1    user views a Facebook profile, that user's IP log would reflect the fact that the user viewed

2    the profile, and would show when and from what IP address the user did so.

3        47.    Social networking providers like Facebook typically retain additional

4    information about their users' accounts, such as information about the length of service

5    (including start date), the types of service utilized, and the means and source of any

6    payments associated with the service (including any credit card or bank account number).

7    In some cases, Facebook users may communicate directly with Facebook about issues

8    relating to their accounts, such as technical problems, billing inquiries, or complaints from

9    other users.  Social networking providers like Facebook typically retain records about such

10   communications, including records of contacts between the user and the provider's support

11   services, as well as records of any actions taken by the provider or user as a result of the

12   communications.

13       48.    As explained herein, information stored in connection with a Facebook

14   account may provide crucial evidence of the "who, what, why, when, where, and how" of

15   the criminal conduct under investigation, thus enabling the United States to establish and

16   prove each element or alternatively, to exclude the innocent from further suspicion.  In my

17   training and experience, a Facebook user's IP log, stored electronic communications, and

18   other data retained by Facebook, can indicate who has used or controlled the Facebook

19   account.  This "user attribution" evidence is analogous to the search for "indicia of

20   occupancy" while executing a search warrant at a residence.  For example, profile contact

21   information, private messaging logs, status updates, and tagged photos (and the data

22   associated with the foregoing, such as date and time) may be evidence of who used or

23   controlled the Facebook account at a relevant time.  Further, Facebook account activity can

24   show how and when the account was accessed or used.  For example, as described herein,

25   Facebook logs the Internet Protocol (IP) addresses from which users access their accounts

26   along with the time and date.  By determining the physical location associated with the

27   logged IP addresses, investigators can understand the chronological and geographic

28   context of the account access and use relating to the crime under investigation.  Such

JACUS AFFIDAVIT - 14
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  information allows investigators to understand the geographic and chronological context

2  of Facebook access, use, and events relating to the crime under investigation. Additionally,

3  Facebook builds geo-location into some of its services. Geo-location allows, for example,

4  users to "tag" their location in posts and Facebook "friends" to locate each other. This

5  geographic and timeline information may tend to either inculpate or exculpate the

6  Facebook account owner. Last, Facebook account activity may provide relevant insight

7  into the Facebook account owner's state of mind as it relates to the offense under

8  investigation. For example, information on the Facebook account may indicate the owner's

9  motive and intent to commit a crime (e.g., information indicating a plan to commit a crime),

10  or consciousness of guilt (e.g., deleting account information in an effort to conceal

11  evidence from law enforcement).

12      49.     Therefore, the computers of Facebook are likely to contain all the material

13  described above, including stored electronic communications and information concerning

14  subscribers and their use of Facebook, such as account access information, transaction

15  information, and other account information.

16          **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

17      50.     Pursuant to Title 18, United States Code, Section 2703(g), this application

18  and affidavit for a search warrant seeks authorization to permit Facebook, and their

19  representatives and employees, to assist agents in the execution of these warrants. Once

20  issued, the search warrants will be presented to Facebook with direction that it identify

21  the account described in Attachment A, as well as other subscriber and log records

22  associated with the SUBJECT ACCOUNT, as set forth in Attachment B.

23      51.     The search warrants will direct Facebook to create an exact copy of the

24  specified account and records.

25      52.     I, and/or other law enforcement personnel will thereafter review the copy of

26  the electronically stored data, and identify from among that content those items that come

27  within the items identified in Section II to Attachment B, for seizure.

28

JACUS AFFIDAVIT - 15
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

53.     Analyzing the data contained in the forensic image may require special technical skills, equipment, and software.  It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common e-mail, database and spreadsheet applications do not store data as searchable text.  The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well.   Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachment B to the warrant.

54.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of messenger communications, chat logs, files, payment records and documents, that identify any users of the SUBJECT ACCOUNT and communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

**CONCLUSION**

55.     Based on the facts set forth in this affidavit, there is probable cause to believe that Wilke, Williams, and potentially other co-conspirators have committed conspiracy in violation of 18 U.S.C. § 371; theft of public property in violation of 18 U.S.C. § 641; depredation of public property in violation of 18 U.S.C. § 1361; trafficking in unlawfully harvested timber in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(1) and 3373(d);

JACUS AFFIDAVIT - 16
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

setting timber afire in violation of 18 U.S.C. § 1855; using fire in furtherance of a felony in violation of 18 U.S.C. § 844(h)(1); and making false statements in violation of 18 U.S.C. § 1001.

56.     Based on the forgoing, I request that the Court issue the proposed search warrants.  This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

David Jacus
Law Enforcement Officer, USFS


The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit by telephone on this __20__ day of November, 2019.

THE HONORABLE DAVID W. CHRISTEL
United States Magistrate Judge

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT A

The electronically stored data, information, and communications contained in, related to, and associated with, including all preserved data associated with Facebook, Inc. account cassie.jean.bebereia (the "SUBJECT ACCOUNT"), as well as all other subscriber and log records associated with the accounts, which are located at premises owned, maintained, controlled or operated by Facebook, Inc. a social media application provider headquartered at 1601 Willow Road, Menlo Park, California, 94025.

ATTACHMENT A - 1
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B

*Particular Things to be Seized*

I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the SUBJECT ACCOUNT listed in Attachment A:

(a)    All contact and personal identifying information, including for user IDs: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(e)    All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

ATTACHMENT B - 1
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All information about the Facebook pages that the account is or was a "fan" of;

(i)    All past and present lists of friends created by the account;

(j)    All records of Facebook searches performed by the account;

(k)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(l)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 371, 18 U.S.C. § 641, 18 U.S.C. § 1361, 16 U.S.C. §§ 3372(a)(1) and 3373(d), 18 U.S.C. § 1855; 18 U.S.C. § 844(h)(1), and 18 U.S.C. § 1001, since April 1, 2018, limited to the following:

- All information relating to logging, timber poaching, chain saws, trips into any United States national forests, and the possession, transportation, storage, or sale of timber, including maple wood;

- All information relating to forest fires or arson, and particularly to the "Maple Fire" that began in the Elk Lake area of the Olympic National Forest on August 4, 2018;

- All communications with or relating to Alan Richert, Shawn Williams, Lucas Chapman, Jason Roberts, Sondra Palafox, Samuel Davies, and Marty Thompson;

ATTACHMENT B - 2
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12

- All communications relating to Justin Wilke's locations between April and September 2018;
- All communications relating to Justin Wilke's and Cassie Bebereia's whereabouts between August and December 2018;
- All photographs of Justin Wilke between April 2018 and September 2018;
- Evidence indicating the Facebook account owner's or Justin Wilke's state of mind as it relates to the crimes under investigation;
- Evidence of Justin Wilke's appearance from June-August 2018;
- Evidence showing what type of dog, if any, Justin Wilke or Cassie Bebereia had in 2018; and
- Evidence bearing on the identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

13
14
15
16
17
18
19
20
21

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

22
23
24
25
26
27
28

ATTACHMENT B - 3
USAO #2019R00380

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970